IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WESTCOAST GROUND SERVICES, INC., *et al.*, <br> *Plaintiffs,* <br><br> v. <br><br> ALLEGRO GROUP, INC., *et al.*, <br> *Defendants.* | CIVIL ACTION <br> NO. 19-1570 |

**PAPPERT, J.**                                                                                     August 21, 2020

<u>**MEMORANDUM**</u>

  West Coast Ground Services, Inc. and Alexander Rubinchik filed a Complaint asserting a claim for breach of contract against Allegro Group, Inc. and claims for tortious interference with contractual relations, defamation and equitable relief against Allegro and its CEO Vadim Voronin. (Dkt. No. 1.) The Clerk of Court entered defaults against Allegro and Voronin and West Coast and Rubinchik moved for the entry of default judgments. (Dkt. Nos. 17 and 20.) The Court held an evidentiary hearing (Dkt. No. 31) and grants Plaintiffs' motions.

I

  One year ago, the Court held an on the record telephone conference to discuss the case's status. (Dkt. No. 10.) During the conference the Court learned that Plaintiffs' counsel had been working to resolve their claims against Defendants through an attorney named Alexander Herman, who was ostensibly Defendants' counsel. (Tr. Aug. 21, 2020 Status Conference ("Status Conf. Tr."), Dkt. No. 33, at 6:9-15.) While Voronin participated in the conference, Herman did not, although it seemed obvious to the Court, despite Voronin's representations to the contrary, that Herman was present

with Voronin and advising him throughout. (*See id.* at 27:24-30:21.). During the call, Voronin demonstrated his command of English and knowledge of the arguments he needed to make. He understood the Court's introductory comments (*id.* at 2:9-11), was able to make legal arguments about jurisdiction (*id.* at 10:3-11:2) and service of process (*id.* at 21:20-23:7) and expressed his disagreement with the dismissal of related litigation. (*Id.* at 27:24-24; 29:1.)

After the Clerk of Court entered defaults against Defendants, and Plaintiffs moved for default judgments (Dkt. Nos. 17 and 20), the Court scheduled a hearing to accept evidence as to the truth of the allegations in the Complaint and the amount of damages, consistent with Federal Rule of Civil Procedure 55(b). (Dkt. Nos. 21, 22, and 27.) In contrast with Voronin's extensive English language interactions with the Court and Plaintiffs' counsel during the telephone conference, during the evidentiary hearing Voronin claimed he did not understand the most basic statements and, for the first time, requested a Russian/English translator.[1] (*See* Tr. July 23, 2020 Evidentiary Hearing ("Hearing Tr."), Dkt. No. 35, at 6:19-20; 10:11-11:9.) He cited his alleged inability to understand English in refusing to be sworn for the proceeding. (*Id.* at 11:5-9.) Voronin, however, has no right to an interpreter. *Cf.* 28 U.S.C. § 1827 (requiring interpreters only in civil "proceedings instituted by the United States"). He also has demonstrated that he can proceed without a translator, having participated in the

---

[1] Due to COVID-19 related limitations on courtroom availability in the Eastern District of Pennsylvania, the evidentiary hearing took place by videoconference. Before the hearing, the parties were instructed to inform the Court whether they anticipated an inability to participate in the videoconference and were provided with an opportunity to conduct a test run of the platform. (*See* ECF No. 27.) Voronin participated in the test run and encountered difficulties with the video feed. (Hearing Tr. 8:23-9:24.) Although he was advised to use a connection other than a cellphone on the day of the hearing, ultimately Voronin accessed the proceedings only by audio, citing similar issues.

status conference at length in English and supposedly without any assistance (*see* Status Conf. Tr. 28:9-13), conducted business in English (Hearing Tr. 8:5-22), signed relevant contracts written in English (Compl., Dkt. No. 1, Exs. A and B), filed a motion to dismiss in English which he represented was his own work (ECF No. 9), and made cogent and detailed objections to the evidence at the evidentiary hearing. (Hearing Tr. 51:1-11.) Despite Voronin's effort to further delay this case by claiming he could not understand English, the hearing proceeded without his sworn testimony.

## II

In September 2018, Allegro and West Coast entered into a Transportation Services Agreement ("TSA") related to Allegro's provision of ground transportation, lodging and meals to commercial flight crews. (Compl., Dkt. No. 1., at ¶ 8.) They also entered into a Confidentiality and Nondisclosure Agreement ("NDA"). (*Id.* at ¶ 6.) Both contracts included forum selection provisions giving "the Federal Courts of the Eastern District of Pennsylvania . . . exclusive jurisdiction over any legal action brought under this Agreement." (*See id.* ¶ 6.) West Coast's clients include Aeroflot Russian Airlines. (July 23, 2020 Evidentiary Hearing Exhibits ("Hearing Ex."), Dkt. No. 37, Ex. 3.)

### A

The TSA required Allegro to "[t]ransport Flight Crews" from the airport to their hotel and back. (Compl., Dkt. No. 1., Ex. A, TSA § 2(a).) Allegro agreed it was "mission-critical that its services have a 100% on-time reliability record . . . ." (*Id.*) It also agreed to provide a "luxury van" subject to West Coast's approval and "quality and spaciousness standards." (*Id.* at § 2(b).) West Coast contends Allegro breached the

TSA by transporting flight crews in an unreliable and non-compliant vehicle. (Compl. ¶ 23.) Alexander Rubinchik, West Coast's Chief Operating Officer and comptroller, testified that Allegro's van's roof leaked, its hood was unpainted, its seats were torn and it had "technical issues" – "from eight cylinders only seven operated, and from the four-gear transmission only three gears operated." (Hearing Tr. at 21:5-23.) Flight crews endured "several delays" because "the vehicle frequently w[ould] not start, or w[ould] not go as fast as it should go." (*Id*. at 21:18-20.) Ultimately, West Coast decided Allegro's van could not satisfy its needs and, with Voronin's assistance, purchased a new Mercedes-Benz van. (*Id*. at 34:14-22, 35:4-7; *see also* Hearing Ex. 7 (invoice for Mercedes vehicle).) Because the TSA required Allegro to provide a vehicle to transport flight crews and Allegro lacked the funds to purchase a replacement, Voronin agreed the van's cost would be deducted over time from West Coast's monthly payments to Allegro. (Hearing Tr. 34:22-35:9.)

West Coast contends Allegro also violated the TSA by selling merchandise to members of transported flight crews either directly or through intermediaries. (*Id*. at 27:17-22.) Because of West Coast's concerns that flight crews might encounter legal difficulties with U.S. Customs and result in image and reputation problems for its airline clients, the TSA bars Allegro's drivers from "offer[ing] or in any way solicit[ing] additional services to be provided by the Flight Crew Members . . . ." (TSA § 2(g); Hearing Tr. 46:10-24.)

On January 25, 2019, West Coast told Voronin it would not use Allegro as its exclusive transportation service provider, citing its right to terminate the TSA and Allegro's "misconduct." (Hearing Ex. 10.) It gave Allegro the option to work "as a third-

4

party transportation service provider" through Memelland LLC, West Coast's "new transportation service provider and dispatcher," starting on February 1. (*Id.*) In a January 31 email to Rubinchik, Voronin said he would not work with West Coast because of the "unexpected contract modification." (Hearing Ex. 8.) Although West Coast owned the van Allegro had been using to transport flight crews by then, Voronin said he would not release the keys until after "full payment" for both his "regular company salary from . . . January 16 to January 31" and the $16,800 van down payment West Coast had deducted from Allegro's payments. (*Id.*)

Allegro had been scheduled to pick up a flight crew the next day, but the van was locked and Voronin had both keys, so West Coast had to use taxis and rent another vehicle with an additional driver to supervise the crew's hotel check in and check out. (Hearing Tr. 31:5-32:21.) West Coast ultimately paid $1,960 to Memelland for additional transportation services rendered between February 1 and 3 because it could not use its van. (*Id.* 36:19-37:6; *see also* Hearing Ex. 11.) It also engaged a locksmith for temporary and permanent replacement keys at a cost of $1,200. (Hearing Tr. 32:21-22; 36:10-12; 38:25-40:9; *see also* Hearing Ex. 11.) To date, Voronin has not returned the van's original keys. (*Id.* at 28:15-16; 40:9-14.) West Coast had to fill the van with diesel fuel for $53.85, purchase a $21.71 emergency road kit and $31.98 emergency triangles before the van could be used to transport crews again. (*Id.* at 37:9-24, 38:9-24; *see also* Hearing Ex. 11.) Memelland also detailed the vehicle for $200 because it "was kind of full of different types of garbage." (Hearing Tr. 37:19-20; 37:25-38-8.)

B

In addition, West Coast contends Allegro violated the NDA because Voronin

5

videotaped certain members of the flight crews he transported.  The NDA requires Allegro to keep "certain information relating to the business operations of" West Coast and its customers "strictly confidential."  (Compl., Dkt. No. 1., Ex. B, NDA § 4.)  "Confidential Information" includes "information on services provided by [West Coast] to its customers such as type of services, location and scheduling of services, names and contact information of other service providers . . . ."  (*Id.* at § 1.)  Rubinchik received a letter from Aeroflot's U.S. General Manager reporting a crew member's complaint that Voronin had videotaped crew without permission.  (Hearing Tr, 26:1-8.)  Aeroflot asked West Coast to have the recordings returned and to make sure that crew members were not recorded again.  (*Id.* at 26:5-8.)  Rubinchik spoke to Voronin about the complaint and although he requested the videos, Voronin never gave them to him.  (*Id.* at 26:20-27:1.)

C

West Coast also asserts Voronin and Allegro interfered in its contractual relations with Aeroflot.  (Compl. ¶¶ 41-45.)  After West Coast terminated its relationship with Allegro, Aeroflot's U.S. General Manager informed Rubinchik about an email Voronin had sent to Aeroflot accusing both of "corruption and misconduct." (Hearing Tr. 28:17-25.)  To ensure that West Coast did not lose its ongoing and valuable relationship with Aeroflot, Rubinchik engaged a consulting company to speak to Aeroflot in Moscow about West Coast's contractual issues with Allegro, including the problematic van, delays and solicitation of flight crews.  (*Id.* at 33:2-21.)  Rubinchik explained that he spent a significant amount of time on "fire extinguishing" or "damage management" with Aeroflot because of Voronin's actions.  (*Id.* at 42: 17-20.)

III

When the Clerk of Court has properly entered a default, the Court may, in its discretion, enter default judgment against a party. Fed. R. Civ. P. 55(b)(2). Proper entry of default requires that (1) the party be properly served and (2) the served party does not timely respond. Fed. R. Civ. P. 55(a) ("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."). If these requirements are met, the Court may consider whether Plaintiffs' factual allegations establish a right to the requested default judgments. *See* Fed. R. Civ. P. 55(b)(2); *see also Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261, 270 (E.D. Pa. 2014) (quoting 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2688 (3d ed. 2013)); *Broad. Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd.*, 555 F. Supp. 2d 537, 541 (E.D. Pa. 2008). Although the Court can accept the Complaint's well-pleaded factual allegations as true, it must determine the legitimacy of any legal conclusions. *See Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990); see also *DirecTV, Inv. v. Asher*, No. 03-1969, 2006 WL 680533, at *1 (D.N.J. Mar. 14, 2006). Three factors govern the Court's ultimate decision to enter a default judgment: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000).

A

The Court previously determined that Voronin was properly served. (*See* Dkt. No. 13 at 2-4.) Because Voronin is Allegro's CEO and shares its address (*see* Compl.

¶ 4), Allegro was also properly served.  Fed. R. Civ. P. 4(h)(1).

Although Voronin, representing himself, moved to dismiss Plaintiffs' Complaint (Dkt. No. 9), he did not prevail (*See* Dkt. Nos. 13 and 14.)  Then he failed to answer the Complaint even though the Court granted him two extensions of time and warned him that if he did not answer the Complaint, Plaintiffs could "move for a default judgment." (Dkt. Nos. 16 and 19.)

Allegro has not answered the Complaint either.  Indeed, because no attorney has entered an appearance on its behalf, it has never appeared in the case even though Voronin is its CEO.  (Compl., Dkt. No. 1 at 4).  "It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel."[2]  *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201-02 (1993).

The Clerk of Court properly entered the defaults against Allegro and Voronin.

B

The next question is whether Plaintiffs have shown they have meritorious claims, because a party in default does not admit conclusions of law.  *See Serv. Emps. Int'l Union Local 32BJ, Dist. 36 v. ShamrockClean, Inc.*, 325 F. Supp. 3d 631, 635 (E.D. Pa. 2018).

1

Allegro breached the TSA.  Under Pennsylvania law, breach-of-contract claims

---

[2] The Court explained this to Voronin in an August 21, 2019 telephone conference. (*See* Tr. Aug. 21, 2019 Telephone Conf., ECF No. 12, at 6:2-4 ("And you're going to have to retain an attorney to represent the interests of Allegro Group, Incorporated, because you cannot, do you understand that?").)  Voronin said that he understood.  (*Id.* at 6:5-7.)  The Court reiterated that absent a lawyer for Allegro, Voronin would not "be able to file any defenses on behalf of [it] and that may result in a judgment being entered against Allegro Group, Inc. at some point[.]" (*Id.* at 17:17-21.)  Voronin again stated that he understood. (*Id.* at 17:22.)

have three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Allegro had a contract with West Coast to provide on-time transportation services to flight crews in a vehicle meeting West Coast's standards. Allegro breached its duty to West Coast by failing to provide a reliable, luxury vehicle. (*See* TSA § 2(b).) Because Allegro's vehicle could not meet the TSA's requirement of a "mission-critical . . . 100% on-time reliability record for pick-up and delivery," (TSA § 2(a)), West Coast ultimately decided it needed to obtain a replacement van. Damages from Allegro's breach of the TSA include substitute transportation for flight crews and the costs West Coast incurred in gaining access to the replacement van, including the costs of replacement keys and safety equipment.

2

Voronin tortiously interfered with West Coast's contractual relations with Aeroflot. To establish a tortious interference claim, Plaintiffs must show

> (1) the existence of a contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Charbonneau v. Chartis Prop. Cas. Co.*, No. CIV.A. 13-4323, 2014 WL 1259567, at *7 (E.D. Pa. Mar. 26, 2014) (citing *Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. Ct. 1997)). West Coast had a contract with Aeroflot to provide transportation services for its flight crews. (Hearing Ex. 3.) Dissatisfied with West Coast's decision to terminate its subcontract for these services with Allegro, Voronin wrote to Aeroflot, and

9

in an obvious effort to harm the relationship between West Coast and Aeroflot, accused Rubinchik of "corruption and misconduct . . . ." (Hearing Tr. 128:19-25; *see also* Compl., Ex. C.) There is no evidence that Voronin's allegations were justified. Although West Coast and Aeroflot's contract remains intact, West Coast suffered damages from Voronin's conduct, as shown by Rubinchik's damage control efforts including the engagement of a Moscow consulting company "to explain to [Aeroflot] what is going on, who is this Vadim Voronin who is writing to them . . . why he is saying the things that he is saying."[3] (32:24-34:9.)

**C**

Plaintiffs will be prejudiced if the Court does not enter the requested default judgment because they have "no other means of seeking damages for the harm caused by Defendant[s]." *Gowan v. Cont'l Airlines, Inc.*, No. 10-1858, 2012 WL 2838924, at *2 (D.N.J. July 9, 2012). Where, as here, Defendants have not answered the claims against them, the Court presumes they lack a legitimate defense. *See, e.g. Joe Hand Promotions, Inc. v. Yakubets,* 3 F. Supp. 3d 261, 271 (E.D. Pa. 2014). Allegro has never appeared. Although Voronin has been present during this litigation, he never answered the Complaint and effectively declined to appear at the default judgment hearing by refusing to be sworn. "[I]t makes little sense for a plaintiff to be required to demonstrate that the defendant does not have meritorious defenses when the defendant has failed to respond." *Hill v. Williamsport Police Dep't*, 69 F. App'x 49, 53 (3d Cir. 2003) (Rendell, J., concurring). And Allegro and Voronin's refusal to engage in the

---

[3] Because Plaintiffs have established meritorious breach of contract and tortious interference claims that permit the imposition of a default judgment against Allegro and Voronin, and because the evidence in the record is not sufficient to support Plaintiffs' separate claim for defamation, the Court does not reach it.

10

litigation process is culpable conduct meriting entry of a default judgment. "[F]or the Court to conclude otherwise would be to reward the recalcitrant or the oppositional and uncooperative." *Eastern Elec. Corp. of New Jersey v. Shoemaker Constr. Co.*, 657 F. Supp. 2d 545, 554 (E.D. Pa. 2009). Defendants "received repeated notices of the proceedings concerning default judgment, from both the Court and Plaintiff[s'] counsel, and consciously ignored them." *Nationwide Mut. Ins. Co. v. Starlight Ballroom Dance Club, Inc.*, 175 F. App'x 519, 523 (3d Cir. 2006). It is appropriate to enter default judgments against Allegro and Voronin.

## IV

The Court must determine whether to grant Plaintiffs their requested monetary damages and equitable relief. *See Comdyn I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990).

### A

Under Section 5(D) of the TSA, Allegro agreed to indemnify West Coast and its officers, owners and agents for "liabilities, obligations, damages, . . . costs, charges, and expenses" arising from Allegro's default or alleged default under the TSA, its failure or its employees' failure "to be in full and complete compliance with the terms and requirements" of the TSA or any negligence or misconduct by Allegro or its employees. (TSA § 5(D).) Upon review of the record, Plaintiffs have supported their claim for: $1,200 for replacement van keys, $1,960 for Memelland's substitute transportation services, $21.71 for a missing emergency kit, $31.98 for missing emergency triangles, $53.85 for fuel; and $200 for cleaning the van. (Hearing Tr. 31:5-32:22, 36:10-12, 36:19-37:6-40:9; Hearing Ex. 11.) There is no evidence in the record to support the $900

requested for missing van seats. And while the Court recognizes that Rubinchik was required to devote time to unwinding the issues created by Allegro's CEO, there is insufficient evidence to support the full requested award of $6,573, (Hearing Ex. 11), an amount Rubinchik calculated by taking his $800,000 annual salary, dividing it by 365 and multiplying it by three – the number of days he believed spent on issues arising from Allegro's breach. (*See* 42:21-43:10.) Based on the record, $2,500 is reasonable compensation for Rubinchick's time spent due to Allegro's breach of the TSA. Accordingly, the Court awards $5,967.54 in monetary damages to West Coast for Allegro's breach of the TSA.[4]

B

Plaintiffs also ask for equitable relief, including an order directing Defendants to provide accurate and complete books and records of services provided to West Coast. (*Id.*) This is warranted under Section 6 of the TSA, which requires Allegro to maintain such records for at least three years and gave Allegro notice that West Coast could "require that complete copies be delivered to [West Coast] upon . . . termination" of the TSA. (TSA § 6.)

Plaintiffs seek the return of any video recordings Defendants made of Aeroflot personnel. This is appropriate under paragraph 8 of the NDA which requires Allegro "to return any original Confidential Information and all copies and reproductions thereof (both written and electronic) in its possession" within 5 days after Allegro "no

---

[4] Although Plaintiffs have established Voronin's liability for tortious interference with West Coast's contract with Aeroflot, they have not set forth enough evidence to support an award of damages. Although Rubinchik had to spend time addressing Voronin's accusations to ensure that Aeroflot would continue to work with West Coast, the contract between Aeroflot and West Coast remains intact and the Court is unable to ascertain the value of the harm arising from Voronin's conduct.

longer provides services to or for [West Coast] . . . ." (NDA ¶ 8.)

Plaintiffs also seek to restrain Allegro and Voronin "from having any contact or communication with any representatives of Aeroflot . . .relating to [West Coast]" and ask that they be "prohibited from providing any ground transportation services to any airline until November 25, 2021." (*Id.*) The requested relief is warranted under Section 8 of the TSA, which bars Allegro from competing with West Coast or attempting to

> directly or indirectly, induce or influence, or attempt to induce or influence any Customer to terminate a relationship or contract which has been formed or is contemplated to be formed with [West Coast], or otherwise divert from [West Coast] any trade or business conducted with [West Coast by any Customer or potential Customer pursuant to such relationships or contracts, or solicit, induce or influence any customer to discontinue, reduce the extent of, discourage the development of or otherwise harm its relationship with [West Coast.]

(TSA § 8.) This restriction applies for a period of three years after the Agreement's termination. (*Id.*) Section 8 explicitly permits West Coast to institute proceedings "in equity to obtain specific performance or a temporary or permanent injunction" in the event of Allegro's breach. (*Id.*)

Specific performance is an appropriate remedy where it is required "to protect the expectancy interest of the non-breaching parties." *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 103 (3d Cir. 1986); Restatement (Second) of Contracts § 357 (1981) ("A court may by injunction direct a party to refrain from doing a specified act. This is appropriate" where "the performance due under the contract consists simply of forbearance, and the injunction in effect orders specific performance.") A narrow and temporary restraint on Allegro and Voronin is appropriate to enforce West Coast's expectations under Section 8 of the TSA. Considering the terms of the parties' agreement, it is appropriate to direct Allegro and Voronin to refrain from providing

13

ground transportation services to Aeroflot and from attempting to induce or influence Aeroflot from terminating its contract with West Coast until November 25, 2021.

Finally, Plaintiffs ask for the return of all keys to the Mercedes Benz van. (Dkt. No. 32-3.) Although the requested relief is not explicitly covered by the TSA's terms, it is within the Court's discretion to order the return of the keys, as the record shows they belong to West Coast.

V

Under the American Rule, prevailing parties are generally not entitled to an award of counsel fees from an adverse party absent a clear agreement, an express statutory authorization, or another established exception. *See Merlino v. Delaware Cnty.*, 728 A.2d 949, 951 (Pa. 1999); *see also Putt v. Yates-American Mach. Co.*, 722 A.2d 217, 226 (Pa. Super. Ct. 1998) ("[W]here one party expressly contracts to pay the other's fees, such an obligation will be enforced."). Section 5(D) of the TSA allows West Coast to recover reasonable attorneys' fees and costs from Allegro in the event of Allegro's default of its obligations under the contract or its failure "to be in full and complete compliance with" the TSA's terms and requirements. (TSA § 5(D)(ii)-(iii).)

Plaintiffs seek reasonable attorneys' fees and costs for services rendered by Eric Heinz and Dean Weisgold. (*See* Dkt. No. 32-3 at 2; Dkt. No. 32-2 (Heinz Invoice for $4,480); Hearing Ex. 13 (Weisgold Invoice for 3,823.13). Eric Heinz is a graduate of the University of Pennsylvania Law School with 36 years of experience and an hourly rate of $400. (Dkt. No. 32.) He billed Plaintiffs for 11.2 hours, or a total of $4,480 for work associated with Allegro and Voronin. (Dkt. No. 32-2.) Dean Weisgold is also a graduate of the University of Pennsylvania Law school with 32 years of experience and a rate of

$350 per hour. (Dkt. No. 32.) He billed Plaintiffs for 32.5 hours of work, or a total of $11,375 for work associated with Allegro and Voronin. (Hearing Ex. 3 (Weisgold Invoice).) According to Weisgold's invoices, he billed Plaintiffs for the following costs: a $400 filing fee, $25.92 in certified mail fees, $57.00 for photocopies, $15.00 for Accurint research and $354 in fees for service and attempted service, or a total of $851.92. (*Id.*) After examining the record, the Court finds that Plaintiff has made a reasonable request for $15,855 in attorneys' fees and $851.92 in costs given the rates charged which are consistent with prevailing market rates, the hours worked, counsels' experience and the costs incurred.

VI

Plaintiffs are also entitled to an award of post-judgment interest pursuant to 28 U.S.C. § 1961(a) ("[I]nterest shall be allowed on any money judgment in a civil case recovered in a district court" and, further, the "interest shall be calculated from the date of the entry of the judgment . . . .")

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.